1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8    MAURICE NAILS,                          No. C 13-0917 SI (pr)
9              Petitioner,                   **ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS AND
10        v.                                 GRANTING CERTIFICATE OF
                                             APPEALABILITY**
11   L.S. McEWEN, Warden,
12             Respondent.
                                        /
13
14                          **INTRODUCTION**
15        Maurice Nails filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. §
16   2254.  The matter is now before the court for consideration of the merits of the habeas petition.
17   For the reasons discussed below, the petition will be denied.
18
19                          **BACKGROUND**
20   Procedural History
21        Nails was found guilty by a jury in Alameda County Superior Court of first degree
22   murder and it was found that he personally used and discharged a firearm that caused death or
23   great bodily injury.  He was sentenced to 50 years to life in prison.  Nails appealed, and the
24   California Court of Appeal reduced the first degree murder conviction to second degree murder
25   but otherwise affirmed the judgment.  Ex. 1.  He was resentenced to 40 years to life in prison.
26   The California Supreme Court denied review of Nails' direct appeal and a later filed habeas
27   petition.
28        Nails then filed this action, seeking a writ of habeas corpus.  On June 13, 2013, this court

issued an order to show cause with respect to the amended petition with claims that: (1) trial counsel provided ineffective assistance by failing to interview two eyewitnesses; (2) Nails' rights were violated when the prosecutor engaged in misconduct by eliciting a hearsay identification of Nails by his brother; (3) the trial court's statement to the jury that Nails was in custody and by seating a deputy nearby during his testimony were inherently prejudicial; (4) the trial court erred in failing to *sua sponte* instruct on voluntary manslaughter and unreasonable self-defense; (5) the trial court and prosecutor mischaracterized the reasonable doubt standard; and (6) the cumulative effect of the foregoing errors rendered the trial fundamentally unfair.  Respondent filed an answer and Nails filed a traverse.

The Crime

The following factual background is taken from the order of the California Court of Appeal:

> Rose Hunt testified that, at about 10:00 or 11:00 p.m. on December 29, 2007, she drove in her Lexus automobile to a club called Geoffrey's on Franklin Street in downtown Oakland.  Her sister Norlena Davis and her friend Ariana were with her. FN3  Rose and Ariana went into the club while Norlena went to pick up two other people, Sheretta Henderson and Lorenzo Newell, who joined them at the club later.  After Norlena returned with Sheretta and Lorenzo, Rose saw Robert Benjamin (Rob), a friend of Lorenzo's, inside the club.  This was the first time she had ever seen him.  Rob danced with Sheretta all night.

> > FN3. Because the witnesses to events that night called people by their first names, we will primarily use first names in setting forth these facts.

> Before going into the club, Rose had been drinking alcohol and she had more than five mixed drinks while she was at the club.  She felt drunk, but not to the point where she could not walk and talk, and the room did not spin.  She took many photographs inside the club with a digital camera.

> Rose left Geoffrey's at about 1:40 a.m. on December 30, shortly before its 2:00 a.m. closing time.  With her were her sister Norlena, Sheretta, Rob and Ariana. Lorenzo was not with them.  There were about 100 people leaving at the same time.  The five of them went to Rose's car and she, Ariana, and Norlena sat in the car, waiting for Sheretta to finish talking to Rob because Sheretta was going to drive.  Rose was sitting in the driver's seat and Norlena was in the front passenger's seat.  Ariana, who was in the back passenger-side seat, started throwing up out the open car door.  Lorenzo walked up while Ariana was throwing up.  Sheretta and Rob were standing and talking on the sidewalk by the rear side of the car.

> Rose knew of a man named Maurice or "Reese" who was Ariana's ex-boyfriend.  Ariana

had talked about him, but Rose had never met him and did not know what he looked like, except from a photograph she saw on Ariana's MySpace page. On the early morning of December 30, as she sat in the car, she did not see the person she knew as Maurice (appellant). Rose remembered talking to an officer later at the Oakland Police Department, but she did not recall telling him that she saw "Maurice" walking towards her car and up to where Rob and Sheretta were talking. She did not see appellant that night and did not see him shoot Rob. She did not remember telling an officer otherwise.

Oakland Police Officer Lisa Ausmus testified that, on December 30, 2007, at approximately 1:48 p.m. [sic - a.m.], she responded to a dispatch regarding shots being fired in the area of 14th and Franklin Streets in Oakland. She arrived at the scene about a minute after receiving the dispatch. There were several hundred people scattered around. She saw an apparent gunshot victim and soon thereafter focused her attention on a young Black female who "just kept yelling, 'Reese ... did it. Reese did it.'" Ausmus tried to talk to her, but the woman "was scared, very, very upset, very excited," and said " 'I don't want to be speaking to the police.'" Ausmus was unable to get any identifying information from the woman, who did not appear to be intoxicated. Less than five minutes later, Ausmus saw Sergeant Brizendine talking with the woman.

Ausmus further testified that she had seen Rose in the witness room at court the previous day, waiting to testify. Ausmus recognized her as appearing similar to the person she had overheard yelling, "Reese did it."

Oakland Police Sergeant Robin Brizendine testified that she was on patrol near Geoffrey's on the early morning of December 30, 2007, when she heard 10 to 15 rapid gunshots coming from nearby. There was no pause between the gunshots; they came "one right after the other." This suggested to her that a single firearm was involved. Brizendine went to the scene, where she made contact with a Black female whom another officer had said was a possible witness. The woman, who refused to give her name, was agitated, upset, and uncooperative. But she did give Brizendine her phone number. Brizendine learned much later that the woman's name was Rose Hunt.

While still at the scene, Brizendine called the woman, who again would not give her name. The woman said she had "seen the whole thing," but she was scared to be seen talking to the police. She did say, however, that she would be willing to go to the police department to be interviewed by investigators. She also asked several times about getting her car released. Brizendine informed the investigators on the case of this conversation. The woman later called Brizendine back, said she was in the lobby of the police administration building, and was willing to speak to someone, although she still refused to give Brizendine her name. Brizendine directed an officer to meet with her.

Oakland Police Officer Michael Finnicum testified that, on December 30, 2007, he was told that a witness had just come to the police station and was asked to meet with her. The person was Rose, and Finnicum interviewed her, taking notes as they talked. They met for about 45 minutes, from 3:40 a.m. to 4:26 a.m. He took her entire statement and then read it back to her. She did not claim that anything he read was inaccurate. But when he asked her to sign the statement, she said that, before she would sign it, she needed to know how to get her car back. He said that after she signed the statement, he would take her upstairs to talk to the investigators about how she could get her car back. But Rose refused to sign anything until she knew what was going on with her car. Finnicum therefore took her upstairs to meet with investigators about her car. He did not see her again after that.

In the statement that Finnicum took from Rose, she said she had gone to Geoffrey's with

her sister, Norlena, and friends, Ariana, Sheretta, Lorenzo and Rob.  When the club closed, they went to her car, and Norlena and Rose got inside while the others stood outside talking.  Rose and Norlena were looking at photographs she had taken inside the club when, at about 1:47 a.m., she noticed Maurice walking from 14th Street and Webster towards her car.  FN4  She knew Maurice because he had been her friend's boyfriend in the past.

> FN4. Rose said she noticed the time because someone called her on her cell phone at 1:47 a.m..

Rose further told Finnicum that Maurice walked up to Rob and stood about five feet away from him.  After about one minute, Maurice and Rob got into a verbal dispute.  She could not hear what the dispute was about.  After another minute or so, Rose saw Maurice reach into his pants pocket and pull out a small black handgun.  She then watched Maurice shoot Rob.  She heard about three or four gunshots and saw flashes of light coming from the gun.  Maurice then turned away and walked on 14th Street back towards Webster.  He turned right towards 12th Street and Rose lost sight of him.  A few seconds later, the police showed up and she flagged them down.  Rose described Maurice as about six feet tall and about 220 pounds.  He was wearing a white shirt and blue jeans with writing across the buttocks area.

Oakland Police Sergeant Caesar Basa, who was investigating the homicide, testified that, on December 30, 2007 at 6:01 a.m., he and his partner, Sergeant Louis Cruz, interviewed Rose.  She told them that she had been at Geoffrey's with Norlena Davis, Ariana Alberty, Sheretta Henderson and Lorenzo Newell.  She said that the victim, Robert Benjamin, was with them too.  They left Geoffrey's at 1:30 a.m. and went to her car.  She said that Ariana got into the right rear seat and was throwing up.  Norlena got into the front passenger seat and Rose sat in the driver's seat.  Rob and Sheretta walked up and stood next to the car, and Lorenzo walked up after them.

Rose said that, a short time later, three or four guys walked up and they were talking to Rob.  About a minute or a minute and a half later, she looked back and saw Rob and Maurice talking.  FN5  She said that she then saw Maurice shoot Rob.  She also said that Rob did not have a gun.  She knew Maurice because Ariana had dated him and also because he was her god-sister's "first love."  She told Sergeants Basa and Cruz that Maurice was 21 years old, lived in the area of West Street, and had a brother named "Mac" who used to work at the post office.  She said Maurice was six feet tall, 220 pounds, had "tapered" black hair, and a tattoo that says "family first" on his arm.  At the time of the shooting, he was wearing a white T-shirt and blue jeans.  She had last seen him about a year and a half earlier.

> FN5. Rose used both the name "Maurice" and "Reese" when describing the assailant.

When Basa asked whether she was willing to provide an audiotaped statement, Rose refused.  They then discussed her car, which Basa explained had to be processed as evidence before being released to her.  FN6

> FN6. On December 30, 2007, Sergeant Basa also interviewed Ariana Alberty, Sheretta Henderson and Lorenzo Newell.

Brandon Brogan testified that he knew appellant because they went to the same high school in Oakland.  Brandon was friends with both appellant and his brother Willie.  On December 29, 2007, in the early evening, Brandon and his brother Frank went to

appellant's house.  Appellant, his brother Willie, and a friend named Tribble (or Trib) were also there.  They had some drinks and decided to go bowling.  They went to a bowling alley, and later decided to go to downtown Oakland.  They drove to Oakland, along with additional friends, in several different cars.  Frank eventually drove home in Brandon's car and Brandon got into a pink car with appellant.  Trib was in the back of the car and he was "wasted drunk."

Brandon acknowledged that when he was later interviewed by police, he told them that two young Black men had come up to the car at one point and pulled out a gun, and that appellant had popped out of the car and asked, "What you all going to do?  Shoot me?" before the men ran off.  Brandon also had told the police that appellant was mad afterwards and that he and "Mac" (appellant's brother Willie Mac) had tried to calm appellant down.  Brandon testified, however, that he had made all of this up so the officers "can finish asking me the questions and I can leave."

Brandon further testified that he and his friends eventually parked in downtown Oakland near a club called Geoffrey's.  He, appellant, and Willie Mac got out of the car and started walking around.  They saw some females near a black car and appellant talked to them.  He did not remember appellant talking to a man or having a confrontation.  Brandon did tell police that appellant pulled out a gun and shot a man, and that he (Brandon) did not see the gun until it was already in the man's face.  He said this because he thought that was what the police wanted him to say and he was scared.  But it was a lie.  In fact, he never saw appellant with a gun in his hand and never saw him shoot anyone.  When he heard the gunshots, they were behind him and he did not see anything.  After the first one, he started running.  Brandon had met Rose before the night of the shooting and did not recall seeing her that night.

Sergeant Basa testified that he interviewed Brandon on February 14, 2008.  Based on information from Charles Tribble, Basa thought Brandon might have been a witness to the December 30, 2007 shooting.  Because Brandon did not respond to phone messages, two officers went to his home.  Brandon's father called Basa and arranged to bring Brandon to the police station to be interviewed.  During the interview, Brandon was cooperative and, at the end, sorrowful about the circumstances of what had happened. He initially told Basa that, after going bowling, he went home.  He then agreed to repeat that statement while being audiotaped.  The audiotaped statement was played for the jury.

After his statement was recorded, Basa told Brandon that he was telling him the truth, but not the whole story, and advised him that what he really needed to talk about was what had happened in downtown Oakland when a shooting had occurred.  Neither Basa nor his partner, Cruz, said or implied that appellant was a suspect in the case.  After about five minutes of discussion, Brandon told the details of what had happened in downtown Oakland.

This second interview with Brandon, which was also audiotaped, was played for the jury.  In that interview, Brandon said that, after leaving the bowling alley, the friends drove downtown.  Once there, Brandon's brother Frank went home and Brandon got into the pink car with Maurice, Willie Mac, and Trib.  As they looked for somewhere to park, they saw some females on the corner and tried to "holla" at them.  But two young Black "dudes" pulled up to the car and one of them pulled a gun out.  Maurice, who had been driving, hopped out of the car and said, "whatchya'll gonna do, shoot me?"  The two men ran off.

Maurice then drove his friends to Geoffrey's club in downtown Oakland.  The club had just "got out," and there were a lot of people out and about. Maurice parked the car near

Geoffrey's and Brandon, Maurice, and Willie Mac got out; Trib was too drunk to get out, so he stayed in the car.  As they walked down the street, trying to "get at females," Maurice saw a girl "with some other dude."  Maurice and the man, whom Brandon had never seen before, started arguing over the girl.  He did not believe the man was one of the men who had pulled the gun on them earlier, although this man "could have been a partna or something, I dunno."  The man who had pulled the gun was darker skinned and had longer hair.

Brandon did not remember what Maurice and the other man were arguing about, but they were yelling.  They were facing each other, about three feet apart, and the man had his hands in his coat pockets as they argued.  Brandon and Willie Mac were standing behind Maurice and their friend "E" was coming down the street, walking toward them.  Then, "like before I know it, Maurice shot him."  Brandon did not know what kind of gun Maurice used since "[a]ll guns look the same to me."  He thought it was gray.  When he saw the gun, Brandon got scared and, after the first shot, he ran.  He heard more shots as he ran, but did not see anything else.  Brandon did not know if the other man had a gun.

Brandon got a ride home with E. Brandon then went to Willie Mac's house to see if he was all right.  Willie Mac went with Brandon to his house and spent the night there. Since the shooting, Brandon had seen Maurice once at a party in San Jose, and Maurice had called him once and asked to borrow some money.

Charles Tribble testified that, on December 29, 2007, after drinking alcohol with friends at appellant's house, they went bowling in Castro Valley, where Tribble drank some more.  They talked about going to downtown Oakland, but Tribble had no memory of leaving the bowling alley or anything that happened after that.  His next memory was being taken out of the pink car and a police officer asking if he knew what had happened. Tribble had a .38 revolver for protection, which he had earlier left in the pink car. After the police found the gun, he was arrested and ultimately pleaded guilty to misdemeanor possession of the gun.  FN7

> FN7. Oakland Police Officer Jeffrey Aspillera testified that Tribble was found unconscious in the back of the pink car, which was parked across the street from where Robert Benjamin had been shot. During a search of the car, Aspillera found a loaded .38 caliber Smith and Wesson revolver in a closed armrest in the back seat.

Sergeant Basa testified that, on February 20, 2008, he interviewed appellant's brother, Willie Mac Nails, and took his statement.  Oakland police were unsuccessful in attempting to locate, subpoena, or serve an arrest warrant on Willie Mac Nails to get him to appear in court in this case.  FN8

> FN8. Sergeant Basa testified that police were also unable to locate and serve subpoenas on, inter alia, Ariana Alberty, Norlena Davis, Sheretta Henderson and Lorenzo Newell.

District Attorney Inspector Harry Hu testified that he had been asked to locate a number of witnesses for the preliminary hearing, including Willie Mac Nails.  Hu went to an Oakland post office where Willie Mac was working as a contract security guard.  He located Willie Mac and served a subpoena on him, which directed him to appear at the preliminary hearing. Willie Mac did not appear pursuant to the subpoena and a no-bail bench warrant was issued for his arrest.  Subsequently, Hu was unable to locate Willie Mac, despite contacting his work, going to his home, and enlisting the assistance of the Oakland Police Department Fugitive Task Force.

6

Katherine Potter, a civilian evidence technician with the Oakland Police Department, testified that she responded to the crime scene on December 30, 2007. Benjamin was lying on the ground and had already been pronounced dead. She collected nine nine-millimeter cartridge casings at the scene.

On January 1, 2008, forensic pathologist Paul Herrmann performed an autopsy on Robert Benjamin. Benjamin was 25 years old, six feet three inches tall, and weighed 228 pounds when he died. There were a total of 11 bullet wounds in his body, including six entry wounds, one reentry wound, and four exit wounds. The entry wounds included one that went into his middle-left chest, which went through both his lungs and his heart; the bullet had been fired from about 18 inches away. Other entry wounds included one through the upper left shoulder near the neck, one through the groin, one through the lower left side of the body, one just above the left buttock, and one grazing the same area near the left buttock. The cause of death was multiple bullet wounds. The bullet through his heart and lungs and the bullet through his groin, which went through the bladder and tore through the pelvis, causing internal bleeding, were the primary ones responsible for Benjamin's death. Benjamin had several drugs in his system, including methamphetamine, MDMA and MDA (ecstasy drugs), as well as alcohol.

Eric Tyrell, custodian of records for Sprint Nextel Telecommunications, produced records for the dates of December 29 and 30, 2007, for a cell phone number that was billed to appellant. There were numerous calls to and from the phone between 1:20 a.m. and 3:32 a.m. on December 30, using the cell site at Alice and 13th Streets in downtown Oakland.

City of San Pablo Police Officer Jose Barajas testified that, on May 4, 2008, he recovered a nine-millimeter Llama pistol in San Pablo after a juvenile male accidentally shot himself in the leg with the gun.

In the opinion of Mark Bennett, a forensic scientist who qualified as an expert in forensic firearm and tool mark examination, all nine casings and all five whole bullets found in this case were fired from the same semiautomatic gun. He was able to determine from the IBIS (Integrated Ballistics Identification System) that police in San Pablo had recovered the gun used in this case. Bennett compared the casings found in this case with casings fired from the recovered gun and determined that all of the casings and bullets in this case were fired from the recovered gun.

Appellant's former girlfriend, Joann Williams, testified that, in December 2007, she was living with her mother in Tracy. She knew appellant as "Reese" and he had a tattoo of a Reese's peanut butter cup on his chest. In the early morning of December 30, 2007, appellant unexpectedly came to Williams's house and woke her up. He was wearing a white T-shirt and jeans. He smelled like alcohol, but did not seem to be under the influence. He was not talkative and they both went to sleep. The next morning, Williams dropped appellant off at his house in Oakland. He was quiet and did not say anything about events of the night before. A few days later, appellant called her and said he was staying with a friend in Sacramento. She believed he stayed in Sacramento for two or three weeks before returning to Oakland.

Oakland Police Officer Bradley Baker testified that, on February 19, 2008, he stopped a car being driven by appellant and arrested him. The passenger in the car was Joann Williams.

Defense Case

Appellant, who was 23 years old at the time of trial, testified that he had grown up in Oakland. After high school, he had gone to Laney College, where he played football and

7

took general classes.  He also worked for a company doing security jobs.  In December 2007, appellant was living in West Oakland with his mother, his younger sister, and an older brother known as "Willie Mac."

On December 29, 2007, appellant and Willie Mac got together with some friends, including Charles, "Trick Daddy," Brandon and Frank.  In the afternoon, they decided to go bowling. Trick Daddy drove by himself, Brandon drove Frank, and appellant drove everyone else in the pink car.  Before going bowling, appellant had not drunk any alcohol, but most of the others had been drinking.

Appellant, his brother, and his friends bowled in Castro Valley for about two hours, starting at 9:00 or 10:00 p.m.  While bowling, they drank alcohol.  Appellant had one or two mixed drinks, but did not feel like he was under the influence.  After leaving the bowling alley, they decided to go to downtown Oakland because "the club let out at a certain time, so we went down there to talk to females."  At that time, appellant had a girlfriend named Joann Williams, but they were not in an exclusive relationship.

The three cars stayed together as they drove around in Oakland. Appellant was in a car with his brother, who was driving the pink car.  They first stopped on Webster near 12th Street.  Two African–American men approached the car appellant was in.  Appellant heard Brandon say they had a gun.  Appellant, who was not drunk, stepped out of the car and asked the men, who did have a gun, what they were going to do.  The incident lasted 10 to 15 seconds.  It was dark and appellant did not really see their faces, but he saw them run off afterwards.  Appellant did not have a gun and did not know that Tribble had a gun or that there was a gun in a compartment in the pink car.

After confronting the two men, appellant got into one of the other cars, a Chrysler 300, with Trick Daddy.  Before the confrontation with the two men, Frank had gone home and Brandon was riding in the pink car with Tribble.  Trick Daddy then parked on Webster Street.  Appellant believed his brother had also parked the pink car, but did not see him at that point.  Appellant and Trick Daddy walked toward a club called Geoffrey's.  They turned left from Webster onto 14th Street and appellant saw quite a few people out on the street; many were standing around and talking.  There were also police in the area.

While appellant and Trick Daddy were at the corner of 14th Street and Webster, appellant heard gunshots.  He saw his brother and Brandon running, and he ran too.  Trick Daddy then drove appellant to Joann Williams's house in Tracy.  He spent the night there and Williams took him home the next day.  Shortly after that, appellant went to Sacramento for a couple of weeks.

Appellant did not know Robert Benjamin and did not shoot him.  He did not know if Benjamin was one of the two men who had pulled a gun on him because he could not see who the two gunmen were.  He did not know Rose Hunt, Sheretta Henderson or Norlena Davis either.  Ariana Alberty had been a female associate of appellant's earlier that year or the year before, but he had not seen her since then.  He had not seen or spoken with a group of women in a Black Lexus.  Appellant had a tattoo that said, "Reese."  Appellant did not know the current whereabouts of his brother, Willie Mac.

On cross-examination, appellant testified that he had known Brandon since he was a teenager.  Brandon was Willie Mac's best friend and appellant did not see him regularly.  Willie Mac visited appellant several times in jail after appellant was arrested.  Appellant already knew that Willie Mac had given a statement to police when Willie Mac visited.  Appellant had read a summary of that statement.  The statement did not surprise him, make him angry, or bother him in the least.  He did not confront Willie Mac about the

8

1    statement.

2    Appellant also read the summaries of Brandon's interviews and saw that Brandon had
     accused him of firing the shots that killed Benjamin.  It upset him when he read that.

3    Brandon's statement was different from Willie Mac's in a lot of ways, although both
     statements described appellant as the shooter.  FN9  Appellant never confronted Willie

4    Mac about the statement.  There came a time when appellant stopped seeing Willie Mac
     at the jail.  A few months before trial, appellant and Willie Mac arranged by phone for

5    Willie Mac to come stand outside appellant's window at the jail to wave at appellant.

6        FN9. The trial court ultimately admitted evidence of the content of Willie
             Mac's statement for its effect on appellant, not for its truth.

7

8    Appellant acknowledged that, in his brother's statement, Willie Mac admitted seeing
     appellant produce a gun and shoot Robert Benjamin.  Appellant also acknowledged that

9    he had not tried to get any family members or friends to find his brother, so that he could
     testify at trial about what had happened.  He said it was not his job to look for Willie

10   Mac.  Appellant did not know where Willie Mac was and did not take any steps to find
     him.  Regarding whether appellant thought it was important for Willie Mac to testify for

11   appellant at trial, appellant said, "It's on him."  Appellant also had read the statements by
     Arianna Alberty, Norlena Davis, Sheretta Henderson and Lorenzo Newell.  He did not

12   have any of their addresses and was unable to help his attorney find them.

13   *People v. Nails*, 2012 WL 758292 *1-8 (Cal. App. 1 Dist. 2012).

14

15                          **JURISDICTION AND VENUE**

16        This court has subject matter jurisdiction over the petition for writ of habeas corpus under

17   28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

18   conviction occurred in Alameda County, California, within this judicial district.  28 U.S.C. §§

19   84, 2241(d).

20

21                               **EXHAUSTION**

22        Prisoners in state custody who wish to challenge collaterally in federal habeas

23   proceedings either the fact or length of their confinement are required first to exhaust state

24   judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

25   highest state court available with a fair opportunity to rule on the merits of each and every claim

26   they seek to raise in federal court.  *See* 28 U.S.C. § 2254(b), (c).  The parties do not dispute that

27   the state judicial remedies were exhausted for the claims in the petition.

28

                                            9

1

2                                    **STANDARD OF REVIEW**

3          This court may entertain a petition for writ of habeas corpus "in behalf of a person in

4   custody pursuant to the judgment of a State court only on the ground that he is in custody in

5   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

6   Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose

7   new restrictions on federal habeas review.  A petition may not be granted with respect to any

8   claim that was adjudicated on the merits in state court unless the state court's adjudication of the

9   claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

10  of, clearly established Federal law, as determined by the Supreme Court of the United States;

11  or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

12  of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

13         "Under the 'contrary  to' clause, a federal habeas court may grant the writ if the state

14  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

15  law or if the state court decides a case differently than [the] Court has on a set of materially

16  indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

17         "Under the 'unreasonable application' clause, a federal habeas court may grant the writ

18  if the state court identifies the correct governing legal principle from [the] Court's decisions but

19  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

20  habeas court may not issue the writ simply because that court concludes in its independent

21  judgment that the relevant state-court decision applied clearly established federal law

22  erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A

23  federal habeas court making the "unreasonable application" inquiry should ask whether the state

24  court's application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.

25         The standard of review under AEDPA is somewhat different where the state court gives

26  no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned

27  lower court decision on the claim.  In such a case, a review of the record is the only means of

28

                                               10

deciding whether the state court's decision was objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

**DISCUSSION**

1.      Ineffective Assistance of Counsel

Nails first argues that trial counsel was ineffective for not interviewing witnesses Norlena Davis or Sherretta Henderson and instead relying on the police interviews of these witnesses.

Standard

The Sixth Amendment to the United States Constitution guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, *see id.* at 691-94.

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689). The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the

1   two apply in tandem, review is doubly so." *Id.* at 788 (quotation and citations omitted). When

2   § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question

3   is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential

4   standard." *Id.*

5       A difference of opinion as to trial tactics does not constitute denial of effective assistance,

6   *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not

7   ineffective assistance simply because in retrospect better tactics are known to have been

8   available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Tactical decisions of trial

9   counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic

10  considerations; (2) counsel makes an informed decision based upon investigation; and (3) the

11  decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456

12  (9th Cir. 1994). Furthermore, trial counsel cannot be ineffective for failing to raise a meritless

13  motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *see, e.g., Hebner v. McGrath*,

14  543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of

15  defendant's prior sexual misconduct as propensity evidence not ineffective where evidence

16  would have been admitted to show common plan or intent).

17

18  Analysis

19      This claim was presented to the California Supreme Court in a habeas petition and denied

20  without a reasoned decision. This court must conduct an independent review of the record to

21  determine whether the state court clearly erred in its application of controlling federal law, and

22  consequently, whether the state court's decision was objectively unreasonable. *Delgado v.*

23  *Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

24      Davis and Henderson were interviewed by police a few hours after the shooting.

25  Reporter's Transcript ("RT") at 656-57. Subpoenas were issued by the prosecution for Davis

26  and Henderson to testify at trial. RT at 685-87. They did not testify at trial. Nails testified that

27  he reviewed the police reports of the interviews with Davis and Henderson. RT at 821. Nails

28

also testified that he was unable to help his trial counsel find these witnesses. *Id.* The substance of Davis and Henderson's statements was not presented to the jury.

Nails argues that trial counsel was ineffective for failing to interview Davis and Henderson. Nails argues that their statements to the police were helpful to his defense, and had these witnesses testified, the outcome of the trial would have been favorable to him. The police reports and a statement by Davis were part of Nails' petition to the California Supreme Court and were provided to this court by respondent. Answer, Ex. 7 at Ex. A.

Davis provided a written statement in which she said that while she was sitting in a car, she saw about three or four men approach the victim. Ex. 7 at Ex. A. According to Davis, one of the men started arguing with the victim. A short while later, Davis heard a loud pop, she looked towards the noise and saw one of the men holding a silver gun. She heard three or more shots and saw flashes of light. She was able to see the man holding the gun, but then she ducked down behind the seat in the car because she thought she was going to be shot. Davis was shown a photo lineup that included Nails, but stated that she did not recognize anyone in the photo lineup. Ex. 7 at Ex. A.

Henderson stated that she was also sitting in the car when she saw the victim talking to four or five men. She heard gunshots and saw a male shooting the victim. Henderson was shown a photo lineup that included Nails, but stated that she did not recognize anyone in the photo lineup. Ex. 7 at Ex. A.

To obtain relief Nails must show that trial counsel was deficient and that but for counsel's errors, the result of the proceeding would have been different. Neither party has presented a declaration from trial counsel regarding why these witnesses were not interviewed. Nails states in his petition that trial counsel did not attempt to interview Davis or Henderson and instead relied on the investigative work of the police. However, Nails testified at trial that he was unable to help trial counsel find the witnesses. RT at 821. While an evidentiary hearing would be useful in determining the circumstances surrounding the efforts to interview these witnesses, it is not necessary because even if trial counsel was deficient, Nails is unable to demonstrate

1  prejudice.

2      A petitioner's mere speculation that a witness might have given helpful information if

3  interviewed is not enough to establish ineffective assistance of counsel. *See Bragg v. Galaza*,

4  242 F.3d 1082, 1088 (9th Cir. 2001), *amended*, 253 F.3d 1150 (9th Cir. 2001).  Without

5  describing the actual testimony a witness would provide that would be helpful to the defense,

6  petitioner cannot establish that there is a reasonable probability that the verdict would have been

7  more favorable to him. *See Matylinsky v. Budge*, 577 F.3d 1083, 1096-97 (9th Cir. 2009);

8  *Bragg*, 242 F.3d at 1088-89; *see also Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000)

9  (rejecting ineffective assistance claim based on failure to call witness where petitioner presented

10  no declaration from witness showing that witness would have provided helpful testimony).

11      Nails does not present any specific allegations from either witness regarding the substance

12  of her proposed testimony.  Nails concludes that they would have testified similar to their police

13  statements.  Assuming that these witnesses' testimony reflected the substance of their statements

14  to police, Nails still cannot show that he was prejudiced.  These witnesses did not state that Nails

15  was not the shooter.  They were shown a photo line-up and could not affirmatively identify the

16  picture of Nails as the shooter from the several photos.  The police reports indicate that the

17  witnesses could provide a general description of the shooter, but no statements from either

18  witness that they could positively identify the shooter that would make their failure to identify

19  Nails in the line-up extremely significant.[1]  While it is possible that these witnesses could have

20  testified that Nails was not the shooter, that was not reflected in the police reports, nor has Nails

21  provided any declarations from these witnesses to support such an assertion.  Nails' hope that

22  their testimony would have benefitted his case is insufficient to warrant habeas relief in light of

23  the exacting standard set forth in *Strickland* and *Harrington v. Richter*, 131 S. Ct. 770 (2011).

24  This claim is denied.

---

27      [1] As the shooting occurred on a street with approximately one hundred people,
presumably there were other witnesses who glimpsed the shooter but could not identify him.
Nails was not prejudiced by the failure to interview all of these people as well.

1    2.    <u>Prosecutorial Misconduct</u>

2         Nails next argues that his rights were violated when the prosecutor engaged in misconduct

3    by discussing a hearsay identification of Nails by his brother during cross-examination and in

4    closing arguments.

5

6         <u>Standard</u>

7         Prosecutorial misconduct is cognizable in federal habeas corpus.   The appropriate

8    standard of review is the narrow one of due process and not the broad exercise of supervisory

9    power.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are

10   violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *Smith v.*

11   *Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged

12   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

13   Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next

14   question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d

15   1101, 1112 (9th Cir. 2005).   A prosecutorial misconduct claim is decided "'on the merits,

16   examining the entire proceedings to determine whether the prosecutor's remarks so infected the

17   trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v.*

18   *Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).

19        The first factor in determining if  misconduct amounted to a violation of due process is

20   whether the trial court issued a curative instruction.  When a curative instruction is issued, a

21   court presumes that the jury has disregarded inadmissible evidence and that no due process

22   violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).  This presumption may

23   be overcome if there is an "overwhelming probability" that the jury would be unable to disregard

24   evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the

25   defendant.  *See Greer*, 483 U.S. at 766 n.8.

26        Other factors which a court may take into account in determining whether misconduct

27   rises to a level of due process violation are: (1) the weight of evidence of guilt, *see United States*

28

15

*v. Young*, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.

Background

Nails testified at trial that he was in the area with his brother, Willie Mac Nails, and Brandon Bogan when he heard several gunshots and ran away. RT at 787, 815. Nails stated he did not have a firearm, did not see the shooting and was not involved. RT at 790, 814-15. He also testified that he did not currently know the whereabouts of his brother Willie Mac Nails. RT at 790. Willie Mac Nails provided a tape-recorded statement to police and was subpoenaed to testify, but attempts to locate him were unsuccessful despite a bench warrant being issued for his arrest. RT at 655, 687, 714-18. As of the time of Nails' cross-examination, no testimony had yet been presented regarding the content of Willie Mac Nails' statement to police; however, in the course of cross-examining Nails, the prosecutor discussed the police report containing Willie Mac Nails' statement. RT at 799. Trial counsel's objections were overruled, and the following exchange occurred between the prosecutor and Nails:

> Q. And so you knew perhaps by reading a summary by Sergeant Basa that your brother Willie had given a statement to the police, correct?
>
> A. Correct.
>
> Ms. Thomas [trial counsel]: Object. Assumes facts not in evidence.
>
> The Court: Overruled.
>
> By Mr. Meehan [prosecutor]:
>
> Q. And you had actually read a summary of what Willie had told the police, correct?
>
> A. Correct.
>
> Q. And did that surprise you that he made that statement to the police?

16

A.  No.

Q.  Did you think that that—you read that statement?

A.  Correct.

Q.   And did you read the final statement in terms of who he described as being the shooter?

Ms. Thomas [trial counsel]: Objection.  Calls for speculation. Calls for hearsay.

The Court: Overruled.

By Mr. Meehan [prosecutor]:

Q.  Did you read his description of who the shooter was?

A. Correct.

Q.  And is it true that he told the police that you were the shooter?

Ms. Thomas [trial counsel]: Objection.  Calls for speculation, for hearsay.

The Court: Calls for hearsay.  [¶]  Sustained.

By Mr. Meehan [prosecutor]:

Q.  You read the statement—when you read what he said to the police, did that make you angry?

A.  No.

Q.  Did you ever confront him about that statement?

A.  No.

Q.  And didn't bother you in the least?

A.  No.

Q.  And you read Brandon Brogan's interview summaries, correct?

A. Correct.

Q.  And you saw that Brandon Brogan had accused you of actually firing the shots that killed this man, right?

A. Correct.

Q.  Did that upset you when you read that?

A.  Correct.

Q.  Was what you read from the Brandon Brogan paperwork pretty much similar to what

17

you read on the Willie Mac paperwork?

Ms. Thomas [trial counsel]: Objection.  Calls for hearsay.

The Court: Overruled.

The witness: No.

By Mr. Meehan [prosecutor]:

Q.  What was different about it?

Ms. Thomas [trial counsel]: Objection. Calls for hearsay.

The Court: Not now. [¶] Overruled.

The witness: A lot of things different.

By Mr. Meehan [prosecutor]:

Q.  Isn't it true that they were the same with respect to Brandon Brogan's description that you were the shooter?

A.  Correct.

Q.  Willie said the same thing, right?

A.  Correct.

Q.  And you knew that when you were actually visiting him?

A.  Correct.

Q.  And you didn't confront him about that?

A.  No.

Q.  You didn't ask him whether it was true that he told the police that?

A.  No.

RT at 799-801.  The exchange continued with more discussion that Willie Mac Nails had implicated petitioner as the shooter.  RT at 803-05.

The California Court of Appeal provided more background regarding this claim:

Although there was no request for an admonition, the court admonished the jury as follows: "Ladies and gentlemen, the discussion of the questions regarding what was in the statement of Willie Mac is not admissible for the truth of what's in that statement.  It was only admitted to show the reaction of the defendant and his actions and response to that, but not what it actually says."

Subsequently, during rebuttal closing argument, the prosecutor stated: "And I just want

18

to touch upon it briefly.  Recall Willie Mac Nails.  Where is Willie Mac?  We know from the records that, and the testimony of then—testimony of Inspector Harry Hu that he was subpoenaed.  We know from other testimony that he was interviewed.  We know from the acknowledgment of [appellant] that he had access to the information related to those interviews of Willie Mac.  I would submit that logic, common sense and our own human experiences tells us that you would do anything within your power to help your brother. The only reason Willie Mac Nails ignored the subpoena for the preliminary hearing and did not materialize for this trial, I would submit, is because he knew his presence here would not help his brother. The best and only way to help his brother under the circumstances was to disappear until this trial was over.

[¶] ... [¶]

".... Then even from [appellant's] perspective in terms of trying to point the finger of accusation the direction other than his own, you would think that he would bring in his brother, Willie Mac, in order to exonerate himself.  Why isn't Willie Mac here?  I would submit same reasons [sic] why it is so difficult for Rose Hunt and Brandon Brogan to be here."  Defense counsel did not object to these comments.

Following closing arguments, the court instructed the jury in relevant part: "During the trial, certain out-of-court statements were offered, not to prove the truth of the matter contained in the statement, but as relevant evidence to explain the conduct of the person hearing or reading the out-of-court statement.  One such statement was the statement made by Willie Mac Nails to Sergeant Basa about the shooting incident of December 30th, 2007.  That statement was offered and admitted not to prove the truth of the contents of the statement, but to explain the actions and conduct of the defendant toward his brother Willie Mac Nails.  The contents of that statement should not be considered for any purpose except for the limited purpose for which it was admitted."

*Nails*, 2012 WL 758292 *10-11.


Analysis

The California Court of Appeal denied this claim:

Respondent argues that appellant has forfeited this issue on appeal due to his failure to object or, in the alternative, that appellant's claim is without merit.  We find, even assuming counsel's objections to some of the alleged misconduct or error were sufficient to preserve the issue and/or that it would have been futile to object further, that any error or prosecutorial misconduct was harmless under any standard of error.  (*See Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Although this indirect evidence that appellant's brother had implicated appellant in the shooting was plainly incriminating, if taken for its truth, any prejudicial impact on the jury was necessarily greatly diminished by the very similar evidence from two other witnesses: Rose Hunt, an acquaintance of appellant's, and Brandon Brogan, appellant's old friend and one of his companions that evening.  Despite their reluctance to testify at trial and their later efforts to recant their separate identifications of appellant as the shooter, this evidence was extremely powerful.  There was no suggestion that these two witnesses even knew each other or had any reason to falsely implicate appellant. Moreover, the idea that they each might have independently and coincidentally falsely

1   accused him of the shooting is absurd.

2   Before trial, both of these witnesses had unequivocally stated that they saw appellant
    shoot Robert Benjamin. Indeed, the evidence showed that Rose Hunt did so three times:
3   first, as she repeatedly yelled, "Reese did it" just after the shooting; second, in her
    statement to Officer Finnicum that appellant was the shooter; and third, in her subsequent
4   interview with Sergeant Basa, in which she said the exact same thing. Thus, defense
    counsel's attempts to negate these identifications as lies and/or a case of mistaken identity
5   clearly were not convincing.

6   The evidence regarding both of these witnesses' identification of appellant as the shooter
    was extremely strong. Their subsequent reluctance to testify at trial and their attempts
7   to backpedal on their prior identification were understandable in the circumstances.
    FN11 That the jury was also informed in general terms that a third person—appellant's
8   brother, Willie Mac—had given a similar statement to police and then disappeared,
    cannot be said to have affected the impact of the already overwhelming evidence of guilt.
9

10      FN11. We also observe that appellant's testimony actually corroborated
        much of what Brandon told police. At trial, Brandon claimed that he had
11      lied, not only when he told police that appellant had shot Benjamin, but
        also when he said that two men had come and pulled a gun on them and
12      that appellant had gotten out of the car and asked if they were going to
        shoot him. Appellant, however, testified about his confrontation with the
13      two men who had come up to the car, thus casting great doubt on Brandon's
        claim of lying to police when he gave his statement.

14   Moreover, the jury already knew that Willie Mac had given a statement to police, had
     been subpoenaed to appear in court as a prosecution witness, and had not been located.
15   The trial court also admonished the jury that evidence regarding the content of Willie
     Mac's statement could not be considered for its truth, and later instructed the jury in detail
16   on this point. The court further instructed the jury that questions and statements by
     attorneys during trial were not evidence. (*See People v. Jones* (2011) 51 Cal.4th 346, 371
17   [regarding presumption that jury follows trial court's instructions].) FN12

18      FN12. We also note that the time the prosecutor spent commenting on this
        point in closing argument was minimal compared with the time he spent
19      commenting on the evidence of Rose and Brandon's identifications of
        appellant as the shooter. The prosecutor's discussion of Willie Mac's
20      identification covered just over one page of reporter's transcript in rebuttal
        closing argument, while the discussions of Rose and Brandon's
21      identifications totaled more than 18 pages of reporter's transcript, in both
        the initial and the rebuttal closing arguments.
22

23   For all of these reasons, we conclude that the alleged errors and misconduct related to
     appellant's brother's statement to police did not affect the outcome in this case and, hence,
24   did not prejudice appellant. (*See Chapman v. California*, supra, 386 U.S. at p. 24; *People
     v. Watson*, supra, 46 Cal.2d at p. 836.)

25  *Nails*, 2012 WL 758292 *11-12.

26      Nails has failed to demonstrate that the state court opinion was an unreasonable

27  application of Supreme Court authority and that his trial was rendered fundamentally unfair as

28

a result of the identification statements.  Nails fails to allege how the prosecutor's line of questions was misconduct, and the trial court allowed the prosecution to continue with the questions.  Neither party nor the California Court of Appeal opinion discussed if Willie Mac Nails' hearsay statements were admissible under state law.[2]  Assuming that the prosecutor's remarks were inappropriate, Nails has failed to establish a due process violation under *Darden*.

The prosecutor's remarks were isolated, occurring only during Nails' testimony and closing arguments.  Willie Mac Nails' identification was not a critical part of the case, as the identification testimony of the other two witnesses who did testify was the vital issue.  The trial court on multiple occasions instructed the jury that the statements were not to be considered for the truth of the matter.  A review of the record does not indicate that the jury was unable to follow the trial court's instructions that would have caused a due process violation.  The California Court of Appeal analyzed Willie Mac Nails' statements and the rest of the evidence presented at trial and found that any error was harmless and did not affect the outcome of the case. This conclusion is not an objectively unreasonable application of Supreme Court authority, thus Nails is not entitled to relief.

3.    Nails' Custody Status

Nails contends that the trial court's statement to the jury that Nails was in custody and having a deputy seated nearby during his testimony were inherently prejudicial.

Standard

Courtroom security arrangements at trial may be so prejudicial as to deprive a criminal defendant of a fair trial in violation of due process.  *See Holbrook v. Flynn*, 475 U.S. 560, 569 (1986).  "To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions 'create the impression in the minds of the jury that the defendant is

---

[2] On direct examination Nails did testify that he was not the shooter, he did not know where his brother was, he did not know why several witnesses had not appeared and he had not asked his friends to threaten another witness.  RT at 790, 814-15.

1   dangerous or untrustworthy.'" *Id.* (citations omitted).

2   A federal court's review of security arrangements is very limited, however. *Ainsworth*

3   *v. Calderon*, 138 F.3d 787, 797 (9th Cir. 1998), *amended*, 152 F.3d 1223 (1998).  All it may do

4   is look at the scene presented to the jurors and determine whether what they saw was so

5   inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial. *See*

6   *id.*  If the challenged practice is not found inherently prejudicial and if the defendant fails to

7   show actual prejudice, the inquiry is over.  *See, e.g., Holbrook*, 475 U.S. at 569-70 (presence of

8   four uniformed state troopers did not unconstitutionally deprive defendant of a fair trial); *Hayes*

9   *v. Ayers*, 632 F.3d 500, 521-22 (9th Cir. 2011) (no inherent prejudice in, and no actual prejudice

10  was shown to have resulted from, heightened security measures that included screening all

11  persons who entered courtroom (with use of hand-held metal detection wand, patdowns, and

12  searches of bags and purses for weapons), locking the courtroom door, and posting an extra

13  deputy in the courtroom and two additional deputies outside the courtroom); *Williams v.*

14  *Woodford*, 384 F.3d 567, 587-89 (9th Cir. 2004) (presence of four uniformed marshals and

15  several other "plain-clothed" guards at trial not inherently prejudicial; defense counsel's

16  statements implying extraordinary security measures cannot support a claim that the security

17  measures at trial undermined the presumption of innocence); *Ainsworth*, 138 F.3d at 797

18  (presence of four, and occasionally six, armed sheriff's deputies at trial was not inherently

19  prejudicial for two defendants charged with capital murder); *King v. Rowland*, 977 F.2d 1354,

20  1358 (9th Cir. 1992) (upholding ratio of three armed guards to single defendant).

21

22      Background

23  The California Court of Appeal set forth the relevant background for this claim regarding

24  what occurred during trial:

25      Before jury selection began, defense counsel said that appellant "prefers that the jury not
        know that he's in custody."  The trial court responded: "They are going to find out
26      anyway.  I tell the jury that.  There's going to be times he's coming out the side door and
        they're going to be there.  It's better that I tell them.  Admonish them upfront."
27
        At the start of jury selection, after introducing the attorneys and appellant, the trial court
28

22

> admonished the prospective jurors: "Now, I want to indicate to you because the way this courtroom is set up, Mr. Nails is in custody, and you may see him entering or exiting the courtroom, if you are on the jury, from that side door which takes you to the holding cell area. You are not to speculate why he is in custody. You are not to consider his custodial status in any way during this trial for any purpose. It is just a matter that is not to be a subject for your consideration."

*Nails*, 2012 WL 758292 *12.

Despite it being known that Nails was in custody, he wore a suit during trial. RT at 230; Petition at 6i. When Nails took the stand to testify, a deputy was seated near him and the trial court stated to the jury:

> Ladies and gentlemen, before we start, it's sheriff's policy that whenever there is a defendant that's in custody and he testifies that a deputy be seated within proximity. You're not to infer anything about that. We're not trying to draw adverse pictures to Mr. Nails. But that's just their policy.

RT at 767.

Analysis

The California Court of Appeal denied this claim:

> "Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion. [Citations.] [¶] Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence." (*People v. Hernandez* (2011) 51 Cal.4th 733, 741 (*Hernandez*).)

> 1. Admonition Regarding Custody Status
> In *People v. Stevens* (2009) 47 Cal.4th 625, 641 (*Stevens*), in the context of discussing the propriety of the trial court stationing a deputy near the defendant while he testified, our Supreme Court noted that "the jury was properly instructed to disregard the fact that defendant was in custody. We presume the jury followed this instruction. [Citation.]" (Fn. omitted.)

> Here, the trial court believed it necessary to give the admonition regarding appellant's custody status in light of the fact that the jury might see him entering and exiting the courtroom by a side door. The court therefore informed the jury to disregard the fact that appellant was in custody. This admonition was appropriate and, as in *Stevens*, we presume the jury followed the court's instruction. (*See Stevens*, supra, 47 Cal.4th at p. 641.) FN13  There was no abuse of discretion. (*See Hernandez*, supra, 51 Cal.4th at p. 741.)

>> FN13. Appellant cites *State v. Gonzales* (Wash.App. 2005) 120 P.3d 645, 648–651, for the proposition that, "[w]ithout any findings of need stated on the record, applying this blanket policy [of informing the prospective jurors about appellant's custody status] and highlighting it for jurors from the outset of trial was manifest error." ~(AOB 40)~ We do not find appellant's citation to a Washington state case useful in this context, especially given

23

our Supreme Court's indication that such an admonition is proper in circumstances like the present ones.

2. Presence of a Deputy During Appellant's Testimony

In *Stevens*, supra, 47 Cal.4th at page 629, our Supreme Court held that stationing a courtroom deputy next to a testifying defendant "is not an inherently prejudicial practice that must be justified by a showing of manifest need." FN14  The court further held, however, that the trial court "may not defer decisionmaking authority to law enforcement officers," but instead must exercise its own discretion to determine, on a case-by-case basis, whether such a security measure is appropriate. (*Stevens*, at p. 642.)  In such a case, the trial court should state its reasons on the record and, although the court imposed no sua sponte duty for it to do so, the trial court also "should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custody status." (*Ibid*.)

> FN14. Appellant acknowledges this holding in Stevens, but nonetheless argues "for purposes of exhaustion of state remedies, that the manifest need standard does indeed apply to the decision to seat a deputy by appellant when he testified." ~(AOB 40)~

The *Stevens* court found that the trial court had properly exercised its own discretion in determining the appropriateness of stationing a deputy near the defendant while he testified. (*Stevens*, supra, 47 Cal.4th at ¶. 642–643.)

Subsequently, in *Hernandez*, supra, 51 Cal.4th 733, 743, the court found that the record there demonstrated that the trial court's decision to station a deputy near the defendant during the defendant's testimony "was not based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result.... [The court's] remarks reveal that the court was following a general policy of stationing a courtroom officer at the witness stand during any criminal defendant's testimony, regardless of specific facts about the defendant or the nature of the alleged crime."  The court concluded: "Where it is clear that a heightened security measure was ordered based on standing practice, the order constitutes an abuse of discretion, and an appellate court will not examine the record in search of valid, case-specific reasons to support the order." (*Id*. at p. 744.)

The *Hernandez* court further explained, however, that the stationing of an officer at the witness stand during a defendant's testimony is not an inherently prejudicial practice and that the error in failing to make a record of case-specific reasons for ordering that procedure is one of state law, properly reviewed under *People v. Watson*, supra, 46 Cal.2d 818. (*Hernandez*, supra, 51 Cal.4th at p. 746.)  The court concluded that the error in that case was harmless, noting that the "[d]efendant was monitored by a single deputy, and, as in *Stevens*, ... nothing in the record suggests that this deputy's demeanor was anything other than respectful and appropriate." (Ibid.)  FN15

> FN15. In *Stevens*, supra, 47 Cal.4th 625, 639, the court had stated that, "so long as the deputy maintains a respectful distance form the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's discretion to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings."  (Fn. omitted.)

24

In the present case, there is nothing in the record demonstrating that the trial court made an individualized determination of the need for a deputy's presence at the witness stand. Indeed, the admonition the court gave when appellant took the witness stand described the deputy's presence as "sheriff's policy." ~(RT 767)~  Accordingly, the court abused its discretion.  (*See Hernandez*, supra, 51 Cal.4th at ¶. 741, 744; *Stevens*, supra, 47 Cal.4th at p. 642.)  We conclude, however, that the error was harmless because it is not reasonably probable that appellant would have obtained a more favorable result absent this error.  (*Hernandez*, at p. 746; *People v. Watson*, supra, 46 Cal.2d at p. 837.)

The trial court admonished the jury not to draw any adverse inferences from a single deputy's presence, and there is no indication that "this deputy's demeanor was anything other than respectful and appropriate."  (*See Hernandez*, supra, 51 Cal.4th at p. 746; *Stevens*, supra, 47 Cal.4th at ¶. 639, 640, 642.)  In addition, given the court's admonition, the jury likely believed that the deputy's presence was a "routine precaution.  Further, the jury was properly admonished to disregard the fact that defendant was in custody," and we presume the jury followed this admonition.  (*Stevens*, at p. 641.)  Finally, as previously discussed (see pt. I, B, ante), the evidence presented at trial strongly supported the jury's verdict.  (*See Hernandez*, at p. 747.)  FN16

> FN16.  Appellant asserts that this case turned on appellant's credibility as a witness and the admonition regarding custody as well as the presence of the deputy "branded appellant as particularly dangerous and untrustworthy in a credibility case involving a violent crime."  However, as the *Hernandez* court explained: "This aspect of the case is not unique.  'In nearly every case when an accused testifies in his own defense, the jury will have to weigh the credibility of the defendant and the alleged victim [or other prosecution witnesses].'  [Citation.]"  (*Hernandez*, supra, 51 Cal.4th at p 746, quoting *Stevens*, supra, 47 Cal.4th at p. 641.)

In sum, we conclude (1) the trial court's admonition regarding appellant's custody status was proper and (2) while the court abused its discretion in failing to engage in a case-specific analysis when it positioned a deputy near appellant during his testimony, the error was clearly harmless.

*Nails*, 2012 WL 758292 *13-15.

As noted above, this court's review is limited to the scene presented to the jurors and determining if it was so prejudicial that it deprived Nails of a fair trial.  Nails has set forth no arguments regarding how the trial court's brief statement concerning his custody status or the presence of one deputy near him while he testified deprived him of a fair trial.  That the trial court erred under state law by not making an individualized determination of the need for the deputy's presence will not provide federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (federal habeas corpus relief does not lie for errors of state law).  The California Court of Appeal found that the trial court's error was harmless, and Nails has not shown an unreasonable application of Supreme Court authority.  The trial court provided the appropriate

1    admonishments to the jury regarding Nails' custody status and that they should disregard it.

2         Nor can Nails demonstrate that the credibility of his testimony was hindered by the trial

3    court's actions.  Nails has set forth no allegations that the deputy's demeanor or actions were

4    somehow inappropriate.  That one deputy sat near Nails only while he testified, a brief part of

5    a multi week-trial, is insufficient to show that he was deprived of a fair trial.  *See Holbrook* at

6    569-70 (presence of four uniformed state troopers did not unconstitutionally deprive defendant

7    of a fair trial); *Hayes* at 521-22 (no prejudice from posting an extra deputy in the courtroom and

8    two additional deputies outside the courtroom); *Williams* at 587-89 (no prejudice from presence

9    of four uniformed marshals and several other "plain-clothed" guards); *Ainsworth* at 797(no

10   prejudice from presence of four, and occasionally six, armed sheriff's deputies at trial); *King* at

11   1358 (upholding ratio of three armed guards to single defendant).  Nails has not shown a

12   constitutional violation, and this claim is denied.

13

14   4.    Failure to Instruct on Unreasonable Self-Defense

15        Nails argues that the trial court erred in failing to *sua sponte* instruct on voluntary

16   manslaughter due to unreasonable self-defense.

17

18        Standard

19        The failure of a state trial court to instruct on lesser-included offenses in a non-capital

20   case does not present a federal constitutional claim.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th

21   Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998).  However, "the

22   defendant's right to adequate jury instructions on his or her theory of the case might, in some

23   cases, constitute an exception to the general rule."  *Solis*, 219 F.3d at 929 (citing *Bashor v.*

24   *Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  *Solis* suggests that there must be substantial

25   evidence to warrant the instruction on the lesser included offense.  *See Solis*, 219 F.3d 929-30

26   (no duty to instruct on voluntary manslaughter as lesser included offense to murder because

27   evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no

28

1  duty to instruct on involuntary manslaughter because evidence presented at trial implied malice);

2  *see also Cooper v. Calderon*, 255 F.3d 1104, 1110-11 (9th Cir. 2001) (no duty in death penalty

3  case to instruct on second degree murder as a lesser included offense because the evidence

4  established that the killer had acted with premeditation, so if the jury found that the defendant

5  was the killer, it necessarily would have found that he committed first degree murder).

6

7  <u>Analysis</u>

8  The California Court of Appeal set forth the relevant background and denied this claim:

9  A. Trial Court Background
10  The trial court instructed the jury on first and second degree murder. (CALJIC Nos. 8.10,
   8.11, 8.20, 8.30.)  It also instructed on voluntary manslaughter based on sudden quarrel
11  or heat of passion.  (CALJIC Nos. 8.40, 8.42, 8.43, 8.44.)  During discussions with
   counsel about instructions, the trial court explained its rejection of an instruction on
12  unreasonable or imperfect self-defense, as follows: "And all the manslaughter instructions
   are being given based upon the testimony of Mr. [Brandon] Brogan that he saw the
13  defendant and the victim arguing and that would be based on the theory of sudden
   quarrel, heat of passion since there doesn't appear to be any basis either from the
14  defendant's testimony or from anybody else that it was an imperfect self-defense
   situation."  FN19

15        FN19. Defense counsel apparently neither requested an unreasonable
          self-defense instruction nor objected to the trial court's decision not to give
16        such an instruction.

17  B. Legal Analysis
   ""'"It is settled that in criminal cases, even in the absence of a request, the trial court must
18  instruct on the general principles of law relevant to the issues raised by the evidence.
   [Citations.]  The general principles of law governing the case are those principles closely
19  and openly connected with the facts before the court, and which are necessary for the
   jury's understanding of the case."  [Citation.]  That obligation has been held to include
20  giving instructions on lesser included offenses when the evidence raises a question as to
   whether all of the elements of the charged offense were present [citations], but not when
21  there is no evidence that the offense was less than that charged.  [Citations.]'"  (*People
   v. Breverman* (1998) 19 Cal.4th 142, 154.)  If there is substantial evidence supporting
22  such an instruction, it must be given even if it is inconsistent with the defense presented.
   (*People v. Barton* (1995) 12 Cal.4th 186, 194–195 (*Barton*).)  However, "the trial court
23  need not instruct on a lesser included offense whenever any evidence, no matter how
   weak, is presented to support an instruction, but only when the evidence is substantial
24  enough to merit consideration by the jury.  [Citation.]"  (*Barton*, at p. 195, fn. 4.)  We
   independently review a claim that the trial court erred in failing to instruct on a lesser
25  included offense.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

26  "Self-defense requires an actual and reasonable belief in the need to defend against an
   imminent danger of death or great bodily injury. [Citation.]  If, however, the killer
27  actually, but unreasonably, believed in the need to defend him or herself from imminent
   death or great bodily injury, the theory of 'imperfect self defense' applies to negate

28

27

malice. [Citation.] The crime committed is thus manslaughter, not murder. [Citation.]" (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261; see CALJIC No. 8.40.)

In the present case, appellant asserts there is substantial evidence in the record showing that he unreasonably believed he needed to defend himself from imminent death or great bodily injury when he took out a gun and shot Robert Benjamin. This evidence includes the facts that Charles Tribble had a gun for protection in the pink car, two men had pulled a gun on appellant and his friends earlier that night, there was some evidence that 10 to 15 shots were fired, and Benjamin kept his hands in his pockets during the argument. Assuming the issue is not forfeited for failure to object (*see People v. Johnson* (2004) 115 Cal.App.4th 1169, 1172), we do not agree that this evidence was sufficient to require the trial court to give an unreasonable self-defense instruction.

First, appellant testified that he did not know that Tribble had a gun in the pink car. Second, Brandon Brogan told police that the man appellant shot was not one of the two men who had pulled a gun on them earlier. Third, Sergeant Brizendine, who testified that she thought she heard 10 to 15 shots being fired, further testified that the rapid, continuous nature of the gunfire, suggested to her that the shots had all come from the same gun. Finally, the evidence that Benjamin had his hands in his pockets during the argument with appellant—without any suggestion of any threatening gestures or other evidence even suggesting that appellant might have believed he was in imminent danger when he shot Benjamin—did not constitute the substantial evidence necessary to require an instruction on this lesser included offense. FN20

> FN20. Indeed, the evidence that appellant had jumped out of a car that same evening and confronted men with a gun undercuts appellant's claim that the evidence showed that, minutes later, appellant was truly concerned about the intentions of a man standing with his hands in his pockets.

Accordingly, the extremely slight evidence to which appellant refers simply is not sufficient to trigger the trial court's *sua sponte* duty to instruct on unreasonable self-defense. (*See Barton*, supra, 12 Cal.4th at p. 195, fn. 4 [trial court is not required to instruct on lesser included offense "whenever any evidence, no matter how weak, is presented to support an instruction"].) This is especially so, given that an instruction regarding unreasonable self-defense would have been completely inconsistent with appellant's defense theory: that he did not have a gun and did not shoot Benjamin. (But cf. *Barton*, supra, 12 Cal.4th at ¶. 194–195.)

*Nails*, 2012 WL 758292 *18-19.

Nails is not entitled to relief as he has failed to present a federal constitutional claim. *See Solis*, 219 F.3d at 929. Regardless, a review of the trial record reveals no error as there must be substantial evidence to warrant the instruction on the lesser included offense. As discussed in the California Court of Appeal opinion, there was scant evidence to support the issuance of the instruction concerning voluntary manslaughter due to unreasonable self-defense. Nails has failed to demonstrate the existence of substantial evidence to support this claim, especially in light of his trial testimony that he did not know the victim and was not involved in the shooting.

The little evidence demonstrating that Nails and the victim were arguing prior to the shooting was insufficient to support an unreasonable self defense instruction.  This claim is denied.

5.    Reasonable Doubt Standard

Nails argues that the trial court and prosecutor mischaracterized the reasonable doubt standard.

Standard

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  This constitutional principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.  *See Yates v. Evatt*, 500 U.S. 391, 400-03 (1991), overruled on other grounds by *Estelle v. McGuire*, 502 U.S. 62, 72 n. 4 (1991).

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.  *See Victor v. Nebraska*, 511 U.S. 1, 6 (1994).  So long as the trial court instructs the jury on the necessity that defendant's guilt be proven beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  *See id.* at 5.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.  *See id.* (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)).  The proper inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard."  *Id.* at 6.

California's reasonable doubt instruction, California Jury Instructions-Criminal ("CALJIC") 2.90, was found constitutionally fit.  Its use of the terms "moral evidence" and

29

"moral certainty," although troublesome, does not improperly dilute the requirement of proof beyond a reasonable doubt.  *See Victor.* at 7-17 (not reasonably likely that moral certainty in CALJIC 2.90 suggests standard of proof lower than due process requires).  CALJIC 2.90 was revised after *Victor* to delete all references to "moral certainty" and "moral evidence."  The post-*Victor* version of CALJIC 2.90 was upheld in *Lisenbee v. Henry*, 166 F.3d 997, 999-1000 (9th Cir. 1999) (use of term "abiding conviction" in defining reasonable doubt is constitutionally sound).

Background

Prior to trial, during jury voir dire, the trial court discussed various aspects of a criminal trial including the reasonable doubt standard to the prospective jurors.  The trial court stated:

> Now, the burden of proof that the prosecution has to meet is what we call beyond a reasonable doubt.  It's the highest burden of proof provided for in the law.  Now, it doesn't mean beyond all possible or imaginary doubt because we can all conjure up some far out unreasonable doubt about almost any subject.  We don't want you to leave your common sense and reason outside when you come in here.

> Reasonable doubt means what it says.  It's a doubt based upon a reasonable evaluation of the facts.  So that's what we want you to do is apply common sense and reason.

> You may have seen the lady of justice who holds the scales of justice.  The way I've done this over the years is when you start a trial, the scales are tipped like this (indicating), substantially in favor of the defendant because the defendant is presumed to be innocent.  The burden placed on the prosecution is to present evidence that brings those scales into balance and then substantially tips those scales in favor of the truth of the charges.  There's no percentage, there's no number ranking.  But you can see that's a fairly substantial movement of those scales, and that's the burden of proof that the people have to meet.

RT, Vol. 6 at 18-19.  The trial court also stated that if a juror only felt "pretty sure that [petitioner] did it, but I can't say I'm convinced beyond a reasonable doubt that he did it.  If that's your mind set, the law requires a verdict of not guilty."  RT, Vol. 6 at 17.

> During closing arguments the prosecutor discussed the reasonable doubt standard, stating:

> You will be told that proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charges are true.

> What I'd like to do is break down the phrase abiding conviction, beyond a reasonable doubt.  And abiding, of course, means enduring, lasting, continuing conviction in this context, to be convinced or to have a strong belief in.

1
2

> So essentially if you have a strong belief in your state of being convinced, enduring and lasting, it is proof beyond a reasonable doubt.

RT at 870.

3
4

After closing arguments the trial court instructed the jury on reasonable doubt and the

presumption of innocence by using CALJIC 2.90:

5
6
7

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.

8
9
10

> Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

11

RT at 898.

12

13

Analysis

14

The California Court of Appeal denied this claim:

15
16
17
18
19
20
21

> . . . The prosecutor's awkward attempt to explain an "abiding conviction" as, inter alia, a "strong belief in your state of being convinced, enduring and lasting, it is proof beyond a reasonable doubt" is somewhat incomprehensible.  But, in the context of the entire argument and the court's instructions, it was not prejudicial.  The prosecutor prefaced these comments by noting, "Obviously, it is my responsibility to prove guilt beyond a reasonable doubt and you will receive the full instruction from [the trial court] with regard to reasonable doubt.  So it's always perilous for attorneys to stand up here and try to talk about reasonable doubt when there's a very keen interest in making sure there's not a mischaracterization or misquoting with regard to an instruction."   Although, unfortunately, the prosecutor did not heed his own advice, these remarks made clear to the jury that the court would instruct it on reasonable doubt and that attorneys are known to mischaracterize such instructions.

22
23
24
25
26
27

> In addition, just after closing arguments, the trial court gave the jury the standard instruction on reasonable doubt, CALJIC No. 2.90 and further instructed with CALJIC No. 1.00: "If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions."  The jury presumably followed these instructions (*see People v. Jones*, supra, 51 Cal.4th at p. 371), which "were sufficient to dispel any potential confusion raised by the prosecutor's argument."  (*People v. Jasmin* (2008) 167 Cal.App.4th 98, 116.)   Thus, given the prosecutor's preface to his very brief—and fairly unintelligible—comment on the meaning of an "abiding conviction," as well as the court's subsequent instructions, we conclude that it is not reasonably probable that, but for counsel's comments, the result of the proceeding would have been different.  (*See Strickland*, supra, 466 U.S. at p. 694.)

28

31

Second, as to the trial court's comments regarding the "scales of justice," it made those comments while "'conducting voir dire, not instructing the jury; its comments "were not intended to be, and were not, a substitute for full instructions at the end of trial."' [Citation.]"  (*People v. Avila* (2009) 46 Cal.4th 680, 716.)  Assuming there was no forfeiture despite counsel's failure to object or request an admonition (*see People v. Johnson*, supra, 115 Cal.App.4th at p. 1172), we conclude that any error in the court's discussion of the need for "substantial movement" of the scales of justice was harmless beyond a reasonable doubt.  (*Chapman v. California*, supra, 386 U.S. at p. 24; compare *People v. Johnson*, at p. 1172 [court's description of reasonable doubt standard as analogous to decisions made in everyday life trivialized standard in a criminal case, which could not be equated with planning vacations and scheduling flights].)

Moreover, as already discussed, the jury was fully instructed with CALJIC No. 2.90, the standard reasonable doubt instruction, which would have dispelled any confusion from the court's extraneous comments.  Hence, appellant has not shown that he was prejudiced by the court's comments.

Finally, appellant claims that CALJIC No. 2.90, the reasonable doubt standard given to the jury in this case, erroneously conveys "an insufficient standard of proof akin to clear and convincing evidence . . . going only to the jurors' duration of belief in guilt, not their degree of certainty."  He also claims that the inadequacy of this instruction "seriously compounded the improper comments from the court and the prosecutor."

First, both the United States and California Supreme Courts have upheld the language in CALJIC No. 2.90.  (*Victor v. Nebraska* (1994) 511 U.S. 1, 13–17; *People v. Freeman* (1994) 8 Cal.4th 450, 503–505; *see also People v. Hearon* (1999) 72 Cal.App.4th 1285, 1286–1287 [rejecting defendant's similar "well-worn argument," noting that this contention "consistently has been rejected by every appellate district"].)  These decisions are binding on us.  (*See Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Second, it is inconceivable that the jury was so confused by the court and prosecutor's brief comments that it did not follow the reasonable doubt instruction as given.

For all of these reasons, we reject appellant's contention that errors relating to the reasonable doubt standard require reversal.

*Nails*, 2012 WL 758292 *20-21.

Nails' argument that the CALJIC 2.90 is legally insufficient is denied because the Supreme Court specifically upheld this jury instruction in *Victor*.  Nor has Nails demonstrated that the trial court or prosecutor's statements regarding reasonable doubt mischaracterized the standard that would provide habeas relief.  While the prosecutor's comments about reasonable doubt could have been confusing, he stated that the jury would be instructed by the trial court. The trial court did properly instruct the jury regarding the standard.  Nails has not shown that the trial court's discussion of reasonable doubt prior to voir dire somehow confused the jury when they heard the jury instructions weeks later following closing arguments.  Other than

32

recounting the trial court and prosecutor's statements, Nails provides no arguments regarding how these statements lessened the prosecutor's burden or led to a conviction in violation of *Winship*. "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). The jury was properly instructed and the state court's decision that the trial court and prosecutor's brief statements did not violate the Constitution was not an unreasonable application of Supreme Court authority. This claim is denied.

6.    <u>Cumulative Error</u>

Nails argues that the cumulative effect of the foregoing claims rendered the trial fundamentally unfair.

<u>Standard</u>

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that the conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See id*. However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error when there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

<u>Analysis</u>

The California Court of Appeal rejected this claim stating "[w]e have concluded that none of the alleged errors were prejudicial. Nor do we find that the cumulative effect of any errors

1   calls into doubt the jury's verdict or undermines the fairness of the trial in this case, particularly

2   in light of the strong evidence of guilt." *Nails*, 2012 WL 758292 *22 (citations and footnote

3   omitted). Here, this court has not found multiple constitutional errors that would warrant habeas

4   relief. Nor was this a case where the government's case was weak. There were two

5   eyewitnesses who observed Nails commit the crime. While these witnesses recanted their

6   statements while testifying, the jury was able to assess their credibility and ultimately found

7   Nails guilty for the crimes. This claim is denied.

8

9   **MOTION TO EXPAND THE RECORD**

10          In addition to filing a traverse, Nails also filed a motion to expand the record to include

11   police paperwork and interview notes prepared by the prosecutor. The court has discretion under

12   Rule 7 of the habeas rules to order expansion of the record for good cause shown. *See* Rule 7,

13   Rules foll. 28 U.S.C. § 2254; *but see Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir.

14   2005) (holding that the provisions of 28 U.S.C. § 2244(e)(2) which restrict the ability of the

15   court to hold evidentiary hearings applies to Rule 7). However, under *Cullen v. Pinholster*, 131

16   S. Ct. 1388 (2011), the court is limited to facts presented to the state court. *Id*. at 1398; *see also*

17   *Runningeagle v. Ryan*, 686 F.3d 758, 773–74 (9th Cir. 2012) (concluding that, under *Pinholster*,

18   petitioner was not entitled to discovery); *Peraza v. Campbell*, 462 Fed. Appx. 700, 701 (9th Cir.

19   2011) ("In summary, to the extent [petitioner] seeks to expand the record through discovery and

20   an evidentiary hearing, beyond what was presented to the state court, we conclude that such

21   relief is precluded by *Pinholster*. . ."). Nails' motion is denied because the majority of the

22   paperwork was not presented to the state court when he exhausted his claims. Regardless, some

23   of the paperwork Nails seeks to add is already part of the record[3], and the remaining paperwork

24   does not relate to claims or issues in this petition.

25          Nails argues that the police reports rebut the state court's finding that certain police

26   _____

27          [3]As discussed in claim one above, several pages of police reports were presented to the
    California Supreme Court on a habeas petition and provided as one of respondent's exhibits. Answer,
28   Ex. 7 at Ex. A.

officers' testimony was credible.  It seems one report states that witness Rose Hunt was interviewed between 3:40 a.m. and 4:26 a.m., while another report identifies the time at 3:27 a.m.  Motion at 2.  This minor discrepancy does not relate to any claim in this petition, and it is immaterial.  Nails also argues that the paperwork shows that Rose Hunt stated that she was unable to see anything because she ducked under the steering wheel upon hearing gunshots.  Yet the paperwork provided does not provide a statement by Rose Hunt stating she was unable to see anything, though it does include statements from Rose Hunt implicating Nails.  The section cited by Nails instead describes how Norlena Davis ducked down behind a seat after the shots were fired and Davis' statement to police is already part of the record.  Regardless, none of this aids Nails' claims.  To the extent that Norlena Davis ducked behind a seat and could not identify the shooter, this discredits Nails' first claim in the petition that Davis should have been interviewed by trial counsel to help bolster his defense.

Nails also includes interview notes from the prosecutor indicating that Rose Hunt stated she could contact Norlena Davis and Sherretta Henderson.  It appears that this corresponds with Nails' claim that his trial counsel was ineffective in failing to interview these witnesses.  That the prosecutor could maybe have contacted these witnesses does not support any of Nails' claims.  The prosecutor was under no obligation to have these witnesses testify, and this information does not further Nails' ineffective assistance of counsel claim.  For all these reasons, the motion is denied.

## A CERTIFICATE OF APPEALABILITY WILL ISSUE

Petitioner has "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and reasonable jurists would find debatable the district court's assessment of petitioner's claim regarding ineffective assistance of trial counsel regarding failure to interview two witnesses and prosecutorial misconduct regarding the hearsay identification.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is GRANTED on the claims of ineffective assistance of trial counsel regarding failure to interview

two witnesses and prosecutorial misconduct regarding the hearsay identification.  A certificate of appealability will not issue as to the remaining claims because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484.  Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

## CONCLUSION

The petition for writ of habeas corpus is denied on the merits.

The motion to expand the record (Docket No. 19) is denied and the clerk will close the file.

IT IS SO ORDERED.

DATED: March 3, 2014

_____
SUSAN ILLSTON
United States District Judge